IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH TOMADA, | ) |
|         Plaintiff, | )  2:10-CV-00856-GEB-DAD |
|     v. | )  ORDER GRANTING SUMMARY |
| OFFICER MARK SIMONSON, | )  JUDGMENT |
|         Defendant. | ) |

Defendant Mark Simonson seeks summary judgment on Plaintiff Joseph Tomada's Fourteenth Amendment substantive due process claim. Defendant argues he is entitled to prevail on his motion since the uncontroverted facts show that he is not liable under the "danger-creation" exception to the general rule that "a . . . failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." (Def.'s Mot. for Summ. J. ("Mot.") 6:14-7:1 (quoting DeShaney v. Winnebago County Dept. Of Social Services, 489 U.S. 189, 197 (1989)).) Alternatively, Simonson argues he "is entitled to qualified immunity" from Tomada's substantive due process claim. (Mot. 17:5.) Plaintiff opposes the motion.

**I. LEGAL STANDARD**

A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "A fact is

'material' when, under the governing substantive law, it could affect the outcome of the case." Thrifty Oil Co. v. Bank of Am. Nat. Trust and Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

When the defendant is the moving party and is seeking summary judgment on one or more of a plaintiff's claims,

> [The defendant] has both the initial burden of production and the ultimate burden of persuasion on [the motion]. In order to carry its burden of production, the [defendant] must either produce evidence negating an essential element of the [plaintiff's claim] or show that the [plaintiff] does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. In order to carry its ultimate burden of persuasion on the motion, the [defendant] must persuade the court that there is no genuine issue of material fact.

Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted). If the moving party satisfies its initial burden, "the non-moving party must set forth, by affidavit or as otherwise provided in [Federal] Rule [of Civil Procedure] 56, specific facts showing that there is a genuine issue for trial." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citation and internal quotation marks omitted). The "non-moving plaintiff cannot rest upon the mere allegations or denials of the adverse party's pleading but must instead produce evidence that sets forth specific facts showing that there is a genuine issue for trial." Estate of Tucker ex rel. Tucker v. Interscope Records, Inc., 515 F.3d 1019, 1030 (9th Cir. 2008) (citation and internal quotation marks omitted).

"A motion for summary judgment cannot be defeated by mere conclusory allegations unsupported by factual data." Angel v. Seattle First Nat. Bank, 653 F.2d 1293, 1299 (9th Cir. 1981). Further, Plaintiff's "mere argument does not establish a genuine issue of material fact to defeat summary judgment." MAI Sys. Corp. V. Peak Computer, Inc., 991 F.2d 511, 518 (9th Cir. 1993).

In addition, Local Rule 260(b) requires:

> Any party opposing a motion for summary judgment or summary adjudication [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." Beard v. Banks, 548 U.S. 521, 527 (2006).

> Because a district court has no independent duty to scour the record in search of a genuine issue of triable fact, and may rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment, . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf.

Simmons v. Navajo Cnty., Arizona, 609 F.3d 1011, 1017 (9th Cir. 2010) (citation and internal quotation marks omitted). However, "[the Court] may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

Evidence must be viewed "in the light most favorable to the non-moving party," and "all reasonable inferences" that can be drawn from the evidence must be drawn "in favor of [the non-moving] party." Nunez

v. Duncan, 591 F.3d 1217, 1222-23 (9th Cir. 2010). Further, "[t]he district court must . . . undertake some initial scrutiny of the inferences that could be reasonably drawn from the evidence . . . to determine whether there remains sufficient probative evidence which would permit a finding in favor of [Plaintiff] based on more than mere speculation, conjecture, or fantasy." Barnes v. Arden Mayfair, Inc., 759 F.2d 676, 680-81 (9th Cir. 1985).

## II. UNCONTROVERTED FACTS

Tomada sues Simonson for personal injuries Tomada sustained in the early morning on July 13, 2008, during an altercation Tomada had with two men after Tomada left the Pastime Bar. (Def.'s Statement of Undisputed Facts ("SUF") ¶¶ 36-39.) Simonson was a City of Benicia police officer on patrol near the Pastime Bar at about 2:00 a.m. that morning, at which time Simonson observed two groups of individuals engaged in a verbal altercation in the street in front of the Pastime Bar. (Simonson Dep. 21:5-22:13.)

Simonson drove his patrol car to the curb in front of the Pastime Bar where the two groups were arguing, so that the passenger's side of the patrol car was next to the curb. (SUF ¶ 12; Tomada Dep. 51:11-16; Simonson Dep. 23:11-24:4.) Simonson's patrol car came to a stop between the two arguing groups, because as Simonson pulled up to the curb, the group comprised of four individuals led by David Apple ("Apple's group") walked into the street and around to the driver's side of the patrol car. (SUF ¶ 14; Tomada Dep. 43:1-9, 44:1-3, 51:14-16; Simonson Dep. 23:16-20.) The other group, comprised of James Bilbrey ("Bilbrey") and David Becchio ("Becchio"), remained on the sidewalk and started walking north as Simonson stopped the patrol car. (Tomada Dep. 41:19; Simonson Dep. 23:17-20, 32:21.)

1       Simonson yelled through his open patrol car windows, "break it
2 up," and instructed the groups to walk in different directions. (SUF ¶¶
3 12, 15; Tomada Dep. 50:21-51:7; Simonson Dep. 29:18-20, 35:8-15.)
4 Meanwhile, Apple and his group yelled at Simonson that "[Bilbrey and
5 Becchio] just pulled a knife." (Tomada Dep. 44:3-4; Apple Decl. ¶ 3;
6 Black Decl. ¶ 3; McDaniels Decl. ¶ 3.) Simonson directed Apple's group
7 "to leave and go down the next side street." (Tomada Dep. 45:12-13; SUF
8 ¶ 15.) While "still yelling back and forth to [Simonson]," Apple's group
9 walked north and turned west on the first side street. (Tomada Dep.
10 46:19-47:10, 47:14-20; Simonson Dep. 33:15-16.)

11       Simonson then "drove north . . . approximately two blocks
12 towards [Bilbrey] and [Becchio]." (SUF ¶ 21.) "As [Simonson] approached
13 in his police car, [Bilbrey] and [Becchio] walked towards [Simonson]."
14 (SUF ¶ 23.) Simonson spoke with Bilbrey and Becchio for six to nine
15 minutes. (Simonson Dep. 40:9-11; Tr. of Prelim. Hr'g 88:12-14, People v.
16 Bilbrey et al., Nos. CVR198866 & CVR199621 (Cal. Super. Ct., Feb. 27,
17 2009).)[1] During the contact and communication, Simonson observed that
18 Bilbrey and Becchio "were adamant there were no problems in the bar and
19 that they wanted to go." (SUF ¶ 24.) "[T]hey were friendly[,] . . .
20 almost jovial. They weren't intoxicated to the point of [being] . . . a
21 danger to themselves. . . . They weren't slurring their speech, they
22 weren't holding onto things to keep their balance. They were standing
23 talking to [Simonson]." (Simonson Dep. 41:9-16.)

24       Simonson determined Bilbrey and Becchio were not "arrestable"
25 and did not appear to be a "danger to themselves or others." (Simonson

---

[1] Simonson's motion includes an unopposed request that judicial notice be taken of certain testimony given in the state criminal proceeding against Bilbrey and Becchio. This request is granted.

5

Dep. 41:21-22; Tr. of Prelim. Hr'g 87:23-88:1, People v. Bilbrey et al., Nos. CVR198866 & CVR199621 (Cal. Super. Ct., Feb. 27, 2009); SUF ¶ 25.) Simonson "notified Police Dispatch to call a cab for [Bilbrey] and [Becchio,]" pursuant to their request. (SUF ¶¶ 24, 27.) "[Simonson] saw [Bilbrey] and [Becchio] flag down a cab. The cab pulled over and the driver relayed that he was going to call a co-worker to give them a ride." (SUF ¶ 28.) "When [Simonson] drove away from [Bilbrey] and [Becchio], they were waiting for a cab" approximately two blocks from where the verbal altercation occurred. (SUF ¶ 29; Simonson Dep. 37:25-38:1.) Simonson returned to the area of the Pastime Bar and "parked across the street . . . , where he could observe the front of the bar." (Pl.'s Response to Def.'s SUF ¶ 20.)

When the verbal altercation between Apple's group and Bilbrey and Becchio began, Tomada was talking on a cell phone outside the bar, where he was waiting to greet Apple. (SUF ¶¶ 4-5; Tomada Dep. 34:12-19.) Tomada was standing "alone" in the doorway to the Pastime Bar smoking a cigarette, "ten feet or less" from the two groups, when the verbal altercation began. (Tomada Dep. 33:24-34:22, 38:11-16, 113:15-16; SUF ¶ 5.) Tomada stayed by the entrance to the bar during the verbal altercation. (SUF ¶¶ 10, 13; Tomada Dep. 43:10-15.)

"After [Simonson] drove away from the bar [to make contact with Bilbrey and Becchio], [Tomada] went inside the bar to get his sister." (SUF ¶ 30.) Tomada remained inside the bar with his sister for "no more than ten minutes." (Tomada Dep. 59:16-22.) Then he and his sister stood outside the bar for "less than five minutes" while they smoked cigarettes. (Tomada Dep. 61:12-62:2.) Tomada saw Simonson's patrol car "backed in behind the real estate building at the corner . . . [with] [h]is parking lights . . . on," but Simonson did not say anything to

6

Tomada. (Tomada Dep. 70:1-71:13.) "When [Tomada] and his sister left the Pastime Bar, they began walking north on First Street." (SUF ¶ 36.) "[Tomada] and his sister were . . . talking and laughing" as they walked away from the bar. (SUF ¶ 37.)

After walking approximately two blocks, Tomada heard "[o]ne or two men . . . yelling" and "realized the yelling was directed at him and his sister." (SUF ¶¶ 37-38; Tomada Dep. 72:12-16, 72:24-73:5.) Tomada recognized Bilbrey and Becchio, who were yelling from across the street, "[a]s the two guys with the knife." (Tomada Dep. 73:8-13.) Tomada responded by returning their profanities. (SUF ¶ 38.) "[Tomada] heard the sound of feet running up behind them, and was then physically assaulted by [Bilbrey] and [Becchio]." (SUF ¶ 39.) Tomada sustained serious and permanent injuries as a result of the attack. (Tomada Dep. 155:2-5, 157:16-20.)

### III. DISCUSSION

Tomada argues that Simonson is liable for his injuries because Simonson "placed [him] in a more dangerous situation" when Simonson "interceded in the situation in a manner that separated [Tomada] from his friends and forced him to walk through a dark, unpopulated area in the same direction that his knife-wielding assailants had gone." (Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Opp'n") 11:6-10.) Simonson argues that the uncontroverted facts "[do] not support any finding that [he] engaged in any affirmative conduct that enhanced the dangers which [Tomada] exposed himself to by drinking, walking in the direction of [Bilbrey and Becchio], and engaging in a verbal altercation with [Bilbrey and Becchio]." (Def.'s Mot. for Summ. J. ("Mot.") 13:19-23.) Tomada counters that "[Simonson] [is] not entitled to summary judgment" because "there

is substantial evidence that [Simonson] placed [him] in a dangerous position . . . ." (Opp'n 17:8-10.)

The danger creation exception to the general rule that a police officer is not liable under the Substantive Due Process Clause for failure to protect a victim from the violence of a private actor applies where the officer "acts affirmatively and with deliberate indifference in creating a foreseeable danger to the plaintiff, leading to the deprivation of the [victim]'s constitutional rights." Huffman v. Cnty. of L.A., 147 F.3d 1054, 1058 (9th Cir. 1998) (internal citations omitted). "In examining whether an officer affirmatively place[d] an individual in danger . . . [the Court] examine[s] whether the officer[] left the [victim] in a situation that was more dangerous than the one in which [the officer] found him." Munger v. City of Glasgow Police Dep't, 227 F.3d 1082, 1086 (9th Cir. 2000).

Tomada argues that Simonson first contacted him when he was part of Apple's group and after he had been threatened by Bilbrey. (Opp'n 6:12-27, 7:1.) Tomada cites the following averment from Apple, Melvin Black, and Michael McDaniels as support for this argument: "Bilbrey began yelling at [. . .] my [group of] friends, which included [Tomada]." (Black Decl. ¶ 2; McDaniels Decl. ¶ 2; Apple Decl. ¶ 2.) However, this "[b]are assertion[] [and] unsupported conclusion[]" "[does] not [contain] facts" sufficient to support drawing the inferences Tomada seeks to have drawn from this evidence; specifically, that Simonson should have known that Tomada was part of Apple's group, and that Tomada had been threatened by Bilbrey and Becchio. Tovar v. U.S. Postal Serv., 3 F.3d 1271, 1279 (9th Cir. 1993); Kim v. United States, 121 F.3d 1269, 1276-77 (9th Cir. 1997) (stating an affidavit in opposition to summary judgment must be based on personal knowledge).

1          Further, it is uncontroverted that Tomada was standing "alone"
2 by the door of the bar, "several feet" from "Apple's group . . . while
3 th[e] yelling was going on," and he remained there when Apple's group was
4 near the patrol car and after Apple's group walked away from the bar.
5 (Tomada Dep. 33:24-34:22, 43:5-15, 113:8-10, 113:15-16.) In addition,
6 Tomada gave deposition testimony that neither Bilbrey nor Becchio had
7 threatened him prior to the time he left the bar. (Tomada Dep. 88:12-
8 89:2.) Later in the same deposition, Tomato also testified in response
9 to a question concerning whether Bilbrey and Becchio were making threats
10 to everyone standing outside the bar that he was "not sure" if he had
11 "any reason" to believe that he was spoken to personally. (Tomada Dep.
12 113:17-114:4.) This response is insufficient to support drawing a
13 reasonable inference that Tomada had reason to believe he was spoken to
14 personally. Further, Tomada did not leave the area of the bar with
15 Apple's group in response to Simonson's directive given to Apple's group;
16 rather, he went back into the bar, where he stayed for a few minutes,
17 following which he smoked a cigarette outside the bar with his sister for
18 "less than five minutes." (Tomada Dep. 61:12-62:2.)

19          Tomada also argues that Simonson "separated [him] from his
20 friends and forced him to walk through a dark, unpopulated area in the
21 same direction that his knife-wielding assailants had gone." (Opp'n 11:6-
22 10). Tomada contends his following deposition testimony supports this
23 argument, in which Tomada describes an interaction he contends took place
24 between him and Simonson after Apple's group started to walk away but
25 before Simonson drove away to make contact with Bilbrey and Becchio:

26     Q.   Okay. So after [Apple] and his friends walked
            away, you said you were yelling at [Simomson] that
27          those guys pulled a knife?

28     A.   [Tomada]    Yes.

9

> Q. Something to that effect?
>
> A. Yes.
>
> Q. Okay. Did [Simomson] say anything to you in response?
>
> A. He had yelled, he more or less kind of stopped me from what I was saying, and at the same time, I don't remember--I remember he had said, "which two guys."
> I had pointed up the street, and at the same time I was still saying it, that those guys pulled a knife, and he had said, he had kind of stopped me from what I was saying.
> He was saying, let those guys walk that way, you go that way, otherwise, everyone here is looking at a drunk in public.
>
> Q. Okay. Did you say anything to [Simonson] in response to that?
>
> A. No.
>
> ...
>
> Q. After he said that, did he say anything else to you?
>
> A. No, he did not.

(Tomada Dep. 53:19-54:15, 55:21-56:1.)

Simonson objects to the admission of this deposition testimony, arguing Tomada "previously testified under oath at the Preliminary Hearing in the matter of *People v. Bilbrey, et al.*, and admitted in response to a request for admission that he did not have any contact or communication with any Benicia Police Officer prior to the physical altercation during which he sustained physical injuries." (Def.'s Reply ("Reply") 8:4-9; see Thornton Decl. Ex. D (Defendant's RFA and Plaintiff's verified responses.) Simonson further argues that Tomada "'cannot create an issue of fact by affidavit contradicting his prior . . . testimony.'" (Reply 8:11-14 (quoting Kennedy v. Allied Mut. Ins. Co., 952 F.2d 262, 266 (9th Cir. 1991)).)

Simonson has not demonstrated that "the contradiction was actually a 'sham.'" Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998-99 (9th Cir. 2009); c.f. Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996) (applying the "sham affidavit rule" to exclude the plaintiff's deposition testimony that contradicted her prior sworn testimony). Therefore, Simonson's request to strike this deposition testimony is denied.

However, Simonson's statement, "let those guys walk that way, you go that way, otherwise, everyone here is looking at a drunk in public," does not support drawing the inference that Tomada seeks to have drawn from this statement; specifically, that Simonson directed Tomada to walk towards Bilbrey and Becchio. (Tomada Dep. 54:10-11.) When viewed in context, this statement instructed Tomada to walk in a different direction from "those guys [who] pulled a knife," since Simonson gave this instruction in response to Tomada's statement expressing concern about "those guys." (Tomada Dep. 53:19-21, 54:10-12.)

Further, the evidentiary record does not support drawing a reasonable inference that Tomada was in a more dangerous situation when Simonson's involvement ended; by the time Simonson ended contact with the two groups, Simonson had quelled the danger attendant to the verbal altercation, following which Bilbrey and Becchio had walked two blocks and were waiting for a cab. Nor does the evidentiary record support Tomada's contentions that Simonson should have known that Bilbrey and Becchio posed a danger to Tomada, and that Simonson directed Tomada to walk in the same direction in which Simonson had directed Bilbrey and Becchio to walk. Therefore, it cannot be reasonably inferred from the evidentiary record that Simonson violated Tomada's Fourteenth Amendment substantive due process right by "act[ing] affirmatively and with

deliberate indifference in creating a foreseeable danger to [Tomada]." Huffman, 147 F.3d at 1058.

Even assuming, *arguendo*, that Simonson violated Tomada's substantive due process right, Simonson is shielded from liability by his qualified immunity defense. "The court applies a two-prong analysis to determine whether officials are entitled to qualified immunity: (1) whether the facts alleged show that the officer violated a constitutional right; and (2) if so, whether that right was clearly established at the time of the event. These two questions may be considered in either order. The linchpin of qualified immunity is the reasonableness of the official's conduct." Rosenbaum v. Washoe Cnt'y, ---F.3d---, 2011 WL 5966207, *3 (9th Cir. 2011) (citations omitted). Therefore, "it is [Simonson's] burden to show that a reasonable officer could have believed, in light of the settled law, that he was not violating [Tomada's substantive due process] . . . right." Munger, 227 F.3d at 1087.

Here, the evidence demonstrates that Simonson quelled a verbal altercation by instructing the two involved groups to leave the bar premises by walking away from it in different directions, which they did. (SUF ¶ 12; Tomada Dep. 46:19-47:10, 47:14-20, 49:3-19; Simonson Dep. 33:15-16.) Simonson then interacted with Bilbrey and Becchio two blocks from the bar, during which time Simonson determined they did not pose a danger to others and were not "arrestable." (Simonson Dep. 40:9-11, 41:9-21; Tr. of Prelim. Hr'g 87:23-88:1, 88:12-14, People v. Bilbrey et al., Nos. CVR198866 & CVR199621 (Cal. Super. Ct., Feb. 27, 2009).) Thereafter, Simonson returned to the area where the bar was located and parked his patrol car so that he was in a position where he had a view of the bar. (Tomada Dep. 69:25-71:7.)

In light of the what Simonson did in quelling the verbal altercation, contacting and interacting Bilbrey and Becchio thereafter so that he could determine whether they posed a danger to others, and then positioning himself near the bar so that he could observe bar patrons, "a reasonable officer [doing what Simonson did under the circumstances] could have believed" that what he did was not a violation Tomada's substantive due process right. Munger, 227 F.3d at 1087. Therefore, Simonson is qualifiedly immune from Tomada's substantive due process claim and Simonson's motion for summary judgment is granted.

## IV. CONCLUSION

For the stated reasons, Defendant's motion for summary judgment is granted, and judgment shall be entered in favor of Defendant.

Dated: January 12, 2012

GARLAND E. BURRELL, JR.
United States District Judge